IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>RENE A. AMAYA-RAMOS,<br><br>        Defendant. | Case No. CR-07-024-N-BLW<br><br>**MEMORANDUM<br>DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion to suppress filed by the defendant. The Court took testimony and heard argument on May 1, 2007, and took the motion under advisement. For the reasons expressed below, the Court will deny the motion.

## FACTUAL BACKGROUND

It was a cold winter morning – 5:30 a.m. on January 12, 2007 – when Deputy Hilton noticed a white vehicle, parked behind a motel, with its hazard

lights flashing.[1]  Concerned for the safety of any occupants, Deputy Hilton checked on the car and found two persons inside, warming-up the vehicle.  When Deputy Hilton asked them questions, he discovered that they spoke only Spanish.

About this time, the defendant came out of the motel, approached Deputy Hilton, and offered to translate.  The defendant told Deputy Hilton that he knew the occupants of the vehicle.  He explained that they had been staying at the motel in room 110.  Acting as interpreter, he obtained the birth dates of both persons, and learned that their names were Martin Gonzalez and Moriso Silva Mendez.  When these two persons were asked for identification, both produced only foreign identity cards – neither had any valid United States identification.

Deputy Hilton then asked the defendant for identification, and the defendant gave Deputy Hilton his Washington State driver's license, listing his name as Miguel Angel Gonzalez-Cruz.  Deputy Hilton obtained the information he needed from the license and returned it to the defendant.

Deputy Hilton then asked a second Deputy who had just arrived on the scene to phone-in a request for a records check of all three of the individuals.  A check of the individuals' immigration status was done through Special Agent Jason Laws at

---

[1] Deputy Hilton's partner apparently played no role in this matter, and the Court will accordingly focus exclusively on Deputy Hilton.

**Memorandum Decision and Order – Page 2**

the Bureau of Immigration and Customs Enforcement (ICE). Deputy Hilton was informed that there were no warrants or any ICE holds for any of the three persons.

Deputy Hilton then left the motel parking lot. That initial encounter lasted about ten to fifteen minutes.

About ten minutes after Deputy Hilton left, he was contacted by Special Agent Laws who asked him to return to the defendant to ask him additional questions. Laws believed that the name on defendant's driver's license – Gonzalez-Cruz – was an alias for Rene Antonio Amaya-Ramos. When Laws ran a check on the Amaya-Ramos name, he found a positive match for a past criminal history. In addition, the records check revealed that a person from El Salvador, with the same name and birth date as were on defendant's driver's license, was deported from California in 1999.

Deputy Hilton returned to the parking lot where he found the defendant talking to some other individuals. Deputy Hilton approached the defendant and told him that Special Agent Laws from ICE had a few questions for him, and asked if he would speak to Laws. The defendant agreed.

Deputy Hilton used his cellphone to call Laws, and then handed the cellphone to the defendant. Laws identified himself as a Special Agent with ICE, and asked whether the defendant would answer some questions.

**Memorandum Decision and Order – Page 3**

Before Laws could ask any questions, the defendant spontaneously revealed his Social Security number.  In response to questions, the defendant also revealed the names of his father and mother and the fact that he was from El Salvador.

Special Agent Laws then asked the defendant to give the cellphone back to Deputy Hilton, and told Deputy Hilton that he would call him back after running another records check with this new information.  Deputy Hilton terminated the call, and asked defendant if he wanted to get out of the cold.  Together, they waited inside defendant's motel room.  In about five minutes, Special Agent Laws called back and directed Deputy Hilton to arrest the defendant.

Deputy Hilton arrested the defendant and took him to the Kootenai County Jail, and an immigration detainer was faxed to the jail by Laws.  Deputy Hilton read the defendant the detainer, and the defendant told Deputy Hilton that he (the defendant) might have failed to complete his Visa paperwork after he entered the United States approximately six years ago.

Later that same day, Laws arrived to transport the defendant to the Border Patrol station in Spokane, Washington.  Laws matched the defendant's appearance with a photograph Laws obtained from the ICE database, and concluded that the photograph depicted the defendant.  Laws then transported the defendant to the Border Patrol Station in Spokane.

**Memorandum Decision and Order – Page 4**

In Spokane, the defendant was interviewed in Spanish by Special Agent Don McPherson. McPherson notified the defendant of his *Miranda* rights, and the defendant waived those rights.

The defendant admitted in a sworn statement that his true name was Rene Antonion Amaya-Ramos and that he is a citizen of El Salvador. The defendant further admitted that he last entered the United States illegally in 2004, had been formally deported and had never received permission to re-enter. After the interview, defendant was booked on immigration charges. On January 17, 2007, the defendant was indicted on a single count of illegal re-entry.

The defendant has filed a motion to suppress, alleging that the Deputies lacked the reasonable suspicion necessary to lawfully stop him and ask for his identification at the motel parking lot. Consequently, defendant alleges, all evidence obtained thereafter, including his statements, must be suppressed. Alternatively, even if that stop was supported by a reasonable suspicion, the defendant argues that the failure of the Deputies to give him a *Miranda* warning early-on renders all of his statements excludable.

## ANALYSIS

Law enforcement officers "do not implicate much less violate the Fourth Amendment by merely approaching an individual on the street . . . [or] by asking

**Memorandum Decision and Order – Page 5**

him if he is willing to answer some questions." *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). The Fourth Amendment is triggered by an investigatory stop, which occurs when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *INS v. Delgado*, 466 U.S. 210, 215 (1984).

An investigatory stop requires a "reasonable suspicion, based upon articulable facts that criminal activity is afoot." *United States v. Summers*, 268 F.3d 683, 686 (9th Cir. 2001). This reasonable suspicion cannot be formed by consideration of racial appearance alone. *United States v. Brignoni-Ponce,* 422 U.S. 873, 885-86 (1975). However, where an encounter does not rise to the level of an investigatory stop, the "predicate for application of the exclusionary rule under *Brignoni-Ponce* is absent, the reasonable cause requirement nugatory, and the agent's motivation for approaching [the defendant] therefore irrelevant." *Kim,* 25 F.3d at 1431.

In *Kim*, an officer approached a car containing the defendant and asked him for identification. *Id.* at 1427. The officer did not use any type of force or aggression toward the defendant, leading the court to conclude that this was not an investigative stop. *Id.* at 1430.

**Memorandum Decision and Order – Page 6**

In *Summers*, the officer approached defendant's parked car without activating his lights or siren, and asked the defendant for identification after the defendant had, on his own accord, walked over to the officer. *Summers*, 268 F.3d at 685. The court found that these circumstances did not constitute an investigative stop. *Id.* at 687.

The defendant's first encounter with Deputy Hilton was much like the encounters in *Kim* and *Summers*. Here, the defendant voluntarily approached Deputy Hilton in the parking lot and offered his services as a translator. Deputy Hilton simply asked the defendant for his identification. There is no evidence that Deputy Hilton demanded to see the identification, or used any type of force or aggression that would lead a reasonable person to believe that he was not free to leave. Thus, Deputy Hilton's request for identification cannot be deemed to be an investigatory stop.

The second encounter was likewise voluntary and not an investigatory stop. Deputy Hilton simply asked defendant if he would answer some questions by Special Agent Laws. Once again, there is no evidence that a reasonable person would have believed that he was not free to leave.

The encounter may have escalated to an investigatory stop when Deputy Hilton suggested the two of them wait inside for Special Agent Laws' return call.

**Memorandum Decision and Order – Page 7**

But even if that was an investigatory stop, the officers knew at that point that (1) the defendant knew (and was staying at the same motel as) the two persons who could provide only foreign identification; (2) a person with defendant's same name and birthdate was subject to a deportation order in 1999, and (3) the defendant spoke halting English. At this point, the officers were not proceeding solely on the basis of improper racial profiling, but had articulable facts creating a reasonable suspicion of criminal activity.

This case is distinguishable this case from *United States v. Manzo-Jurado*, 457 F.3d 928 (9th Cir. 2006), cited by the defendant. There, the officers clearly engaged in an investigatory stop – while one of the officers approached the defendant's car with her gun drawn, another officer removed the keys from the ignition and demanded that the car's occupants put their hands in plain view. *Id*. at 934, n. 3. Those facts certainly amounted to an investigatory stop. In contrast, the encounters here share none of the indicia of restrictions on leaving present in *Manzo-Jurado.*

In addition, the officers in that case had no reasonable suspicion of criminal activity. The Circuit held that they "lacked information beyond [racial] factors forming a broad profile that would cover many lawful newly-arrived immigrants." *Id*. at 939-40. In contrast, Deputy Hilton had, as discussed above, much more.

**Memorandum Decision and Order – Page 8**

Thus, even if that second encounter was an investigatory stop, Deputy Hilton did not repeat the errors committed by the officers in *Manzo-Jurado* that led to exclusion in that case.

The defendant argues next that nobody read his *Miranda* rights to him until Special Agent McPherson did so in Spokane, and he seeks to exclude anything he said or did before that point. The Court finds, however, that the defendant provided information voluntarily, first to Deputy Hilton during the initial parking lot encounter, and second to Special Agent Laws on the telephone during the next parking lot encounter. Such voluntary statements are not considered the product of interrogation and hence do not trigger *Miranda's* requirements. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

For all of these reasons, the Court will deny the motion to suppress.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to

**Memorandum Decision and Order – Page 9**

suppress (Docket No. 17) is DENIED.



DATED: **May 2, 2007**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 10**